2004 VT 90

## USGen New England, Inc. v. Town of Rockingham

[862 A.2d 269]

No. 03-072

Present: **Amestoy, C.J.,**[1] **Dooley, Johnson, Skoglund and Reiber, JJ.**

Opinion Filed September 17, 2004

---

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.

*Robert E. Woolmington* of *Witten, Woolmington, Campbell, Boepple & Welford, P.C.*, Manchester Center, for Plaintiff-Appellant.

*Richard H. Saudek* and *David L. Grayck* (On the Brief) of *Cheney, Brock & Saudek, P.C.*, Montpelier, for Defendant-Appellee.

¶ 1. **Dooley, J.** USGen New England, Inc. (USGen) appeals from a Windham County Superior Court order setting the value of its Bellows Falls hydroelectric facility in the Town of Rockingham (Town) at $90,377,100 for property tax purposes. The facility spans the Connecticut River and is partly in Vermont and partly in New Hampshire. In reaching its decision, the superior court heard testimony from three valuation experts, two presented by the Town — Dr. Richard Silkman and Bruce Biewald — and one presented by USGen — Todd Filsinger. The experts' estimates varied greatly, ranging from Dr. Silkman's estimate of $100,419,000 to Biewald's of $76,505,700 to Filsinger's of $32,706,401. Prior to Dr. Silkman's appearance, USGen moved to exclude his testimony arguing that he was unqualified to offer an opinion as to value and that his valuation methodology did not pass muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The trial court denied this motion, heard from all three

experts, and in its order relied principally on Dr. Silkman's testimony. The trial court's order also accepted the Town's recommendation and allocated 90% of the value of USGen's facility to the Town of Rockingham. USGen now appeals, arguing that the trial court erred when it: (1) admitted Dr. Silkman's testimony; (2) relied on Dr. Silkman's testimony; and (3) accepted the Town's allocation. We affirm.

¶ 2. As the trial court observed, "[t]his is the second installment of a saga of litigation spawned by the partial deregulation of the markets for electrical power." The first installment began in 1998 when the Vermont General Assembly temporarily froze the grand list valuation of hydroelectric generating facilities for property tax purposes. As a result of this freeze, the value of USGen's facility for 1998, 1999, and 2000 remained unchanged from its 1997 value. USGen subsequently challenged the freeze's constitutionality in the Windham Superior Court. In that case, the court ruled that the freeze was constitutional, and we affirmed in *USGen New England, Inc. v. Town of Rockingham*, 2003 VT 102, ¶ 1, 176 Vt. 104, 838 A.2d 927 (*USGen I*).

¶ 3. Once the freeze expired, USGen challenged the frozen value for tax year 2001. Accordingly, the Town and then the court had to determine the value of the plant as of April 1, 2001. In *USGen I*, foreshadowing this case, we discussed the substantial difficulties associated with valuing a hydroelectric plant in a deregulated electrical power market. *Id.* at ¶¶ 21-23. As we stated in that opinion, "the income-production of [the] hydroelectric facility will be extremely relevant, if not determinative, to its value." *Id.* at ¶ 21. Consistent with that observation, the parties agreed that the income capitalization method was the preferred method of valuing the facility. See generally *Beach Props., Inc. v. Town of Ferrisburg*, 161 Vt. 368, 372, 640 A.2d 50, 52 (1994) (discussing the accuracy of the income capitalization method). As this litigation proceeds into its second installment, the battle between the experts in the proceedings below and the arguments USGen now advances in this Court proves the accuracy of our previous observation.

¶ 4. Before delving into the specifics of the experts' testimony, it is helpful to present some background information both about the Bellows Falls facility and the electrical power market. The Bellows Falls hydroelectric facility is located on the Connecticut River and was first placed into service in 1928. In 1999, USGen purchased the plant from New England Power Company (NEPCO). By the Town's estimate, USGen acquired 87% of the property formerly owned by

NEPCO. The property consists of the Bellows Falls station, a dam (located almost entirely in Walpole, NH), and a reservoir.

¶ 5. Although the issue in this litigation is the valuation of these capital assets, the value of this unique property must be reached through a determination of the income that these assets will generate. When the price of wholesale power was regulated, that income was stable and predictable. Deregulation of wholesale power prices introduced uncertainty and volatility into power markets, resulting in the difficulty of valuing the assets that produce that power.

¶ 6. According to the evidence in this case, the price of electrical energy is set through bilateral contracts and sales on the spot market. If a plant sells its electrical energy through bilateral contracts, it enters into agreements with buyers in advance of the delivery, specifying the time of delivery, the quantity, and the price. Many of these contracts are arrived at through brokers, who operate a market in energy futures contracts. One of the brokers, Natsource, is frequently consulted for determining the price of energy because it makes its trading information public. The trial court in this case found that "the forward prices being reported by Natsource compared very closely to futures reported by two other trading sources, TFS and Platt's MW Daily, as well as Energy Argus, a source of energy price projections relied upon by [USGen's expert]."

¶ 7. On the spot market, each power generator submits bids stating the price at which it would sell a certain amount of electricity for each hour in the next day. After the bids have been submitted, the regional administrator considers all the bids submitted by various regional power plants and then accepts the bids, starting with the least expensive, to meet the area's power demands. Once the demand for power is satisfied, the regional administrator looks at the cost of the last kilowatt hour needed to meet the demand. The cost of this kilowatt hour sets the "market clearing price" for that hour. The market clearing price then becomes the price that is paid to all suppliers selected to provide power for that hour.

¶ 8. As we explained in *Beach Properties*, the income capitalization approach to valuation converts the future benefits of property ownership — that is, the income the property will generate — into an expression of present worth. *Id.* For a business property like the one before us, income to the owner is the reason to hold the property. Valuing the property based on its anticipated income is done as follows:

The income approach is based on the proposition that a rational investor would pay the fair market value for a piece of property, which is the price (P) that, when multiplied by the rate of return available from alternative investments of comparable risk (the capitalization rate or R), is equal to the property's expected net income (I). In other words, if the known factors are capitalization rate and net income, the price of the property may be calculated by dividing the net income by the capitalization rate: $P = I/R$.

*Id.*

¶ 9. In this case, the experts agreed on the use of the above methodology, the period over which the expected income should be measured, twenty years, and the capitalization rate. Although not central to this appeal, they disagreed over the costs to be incurred in generating the income. The real disagreement that explains the wide variation in valuations reached by the experts was over the expected income from the plant. This income, in turn, has a number of components, including electrical energy and generating capacity. Almost all of the variations in the experts' valuations can be explained by disagreements over expected income from the sale of electrical energy.

¶ 10. The dispute started when the Town listers relied upon Dr. Silkman's valuation of $102,608,000 for the entire property. The Town then allocated 90% of that value to Rockingham, on the basis that 90% of the asset value was located in the Town. After the allocation, the Town listed USGen's facility at $90,992,200.[2] Pursuant to 32 V.S.A. § 4467, USGen appealed this assessment to the superior court challenging both the stated value of the facility and the allocation calculation.

¶ 11. During the superior court appeal, both the Town and USGen presented the testimony of the three experts who valued the Bellows Falls plant. The Town presented the testimony of two experts, Silkman and Biewald, although their conclusions conflicted on a number of points. The Town presented additional testimony from Laurie A. Rowell, a lister for the Town, who described its allocation process. USGen presented the testimony of Filsinger.

---

[2] Dr. Silkman acknowledged he made a computational error. The corrected value of Dr. Silkman's estimate, after the allocation, would be $90,377,100.

¶ 12. The admission of Dr. Richard Silkman's testimony is the central point of contention in this appeal. He has a Ph.D. in economics, and his primary occupation is as president of a company that brokers energy supply contracts in the New England power market. His qualifications to testify in this case are described in more detail *infra*. The other expert witnesses have more traditional backgrounds for valuing properties. USGen's expert, Todd Filsinger, is a professional engineer and certified appraiser. He has appraised numerous power plants and has consulted on the financing of power plants in the deregulated market.

¶ 13. In his report, Dr. Silkman explained his method of determining expected income from the sale of electrical energy:

> I used market-based prices for two components of "electricity" — energy and capacity — in developing the estimate of revenues in the valuation model. The prices of energy were derived from forward prices for energy (per MWh) as these existed on or about April 1, 2001, as reported by Natsource, an electricity broker that publishes its forward prices for energy and capacity each trading day. The forward energy prices are reported by Natsource for each month for the on-peak and off-peak hours during that month. Since the forward prices are for April 2001, the prices reported for January through March are for calendar 2002.
>
> The forward prices for energy are then weighted by the estimated MWhs of generation during the on-peak and off-peak hours each month to create an "effective" or average energy price for that month. The monthly forward prices and the effective prices for each month are shown in Exhibit B, along with the estimated MWh of generation during the on-peak and off-peak hours each month.

On April 2, 2001, the work day closest to April 1, 2001, Natsource reported bid and ask prices for contracts for NEPOOL[3] power for delivery in months in the following year. For some of those months, there are bid and ask prices for that month. Others are aggregated into two-month blocks. Thus, Dr. Silkman used seven data elements to derive the prices for the twelve months following the valuation date. He assumed sales at the midpoint between bid and ask prices. From

---

[3] NEPOOL is an acronym for the New England Power Pool, which administers the New England transmission system and wholesale power market. NEPOOL power means power generated in New England.

this, he derived the "annual average price per Mwh" for April 1, 2001 through March 31, 2002 as $54.41. In estimating electric energy costs for the nineteen years thereafter, he held the 2001-2002 average price constant for three years and then increased it by an average rate of inflation of 2.5% for the remaining sixteen years.

¶ 14. Following Dr. Silkman's deposition, USGen moved to exclude his testimony as insufficiently reliable under the *Daubert* standard. The main basis of the admissibility challenge, as it has evolved in the superior court and this Court, is that the seven Natsource data elements are insufficient to determine a twenty-year projection of energy sales income. The trial judge rejected this argument before trial and in more detail in his decision. Before we address USGen's arguments, we must decide three preliminary questions about the applicability and application of *Daubert* to this case.

¶ 15. The narrow question in *Daubert* was whether the adoption of Federal Rule of Evidence 702 had altered the prevailing test for admission of novel scientific evidence first articulated in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). Under the *Frye* test, scientific evidence was admissible only upon a showing that the scientific principles supporting the evidence had gained general acceptance in the relevant scientific community. 293 F. at 1014. The *Daubert* Court held that the *Frye* test did not survive and had been replaced by flexible standards of relevance and reliability. *Daubert*, 509 U.S. at 587-89; see also *State v. Streich*, 163 Vt. 331, 342-43, 658 A.2d 38, 46-47 (1995) (adopting and explaining *Daubert* standard). Although it was no longer necessary under *Daubert* to show that the proffered evidence had gained general acceptance in the relevant scientific community, the Court stated that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The necessity that scientific evidence be both relevant and reliable is derived from Fed. R. Evid. 702, which read as follows when *Daubert* was decided:[4] "If

---

[4] Federal Rule of Evidence 702 was amended in 2000 to codify the Court's decision in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Rule 702 now reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reli-

scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

¶ 16. The Court addressed both components — reliability and relevance — stating that reliability is assured if the evidence is supported by "scientific knowledge." *Id.* at 589-90. The Court further explained that, "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation — *i. e.*, 'good grounds,' based on what is known." *Id.* at 590. Perhaps recognizing that the "scientific knowledge" and "good grounds" were somewhat amorphous concepts, the Court went on to provide some "general observations," *id.* at 593, in the form of nonexclusive factors. The following factors are intended to assist trial judges in determining whether expert testimony is sufficiently supported by "scientific knowledge" so as to be admissible: (1) whether the scientific technique or methodology involved can be tested, *id.*; (2) whether the technique or methodology has been subjected to peer review and publication, *id.*; (3) the known or potential rate of error particular to the technique or methodology, *id.* at 594; and (4) whether the technique or methodology has been generally accepted in the scientific community. *Id.* The Court stressed that these factors were not exhaustive and that the admissibility standard under *Daubert* is a flexible one. *Id.* at 593-94. Relevancy, under the Court's decision, is essentially determined by considering if the expert's testimony "will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592.

¶ 17. Because the *Daubert* opinion was explicitly limited to scientific evidence, it was unclear whether the *Daubert* framework was also applicable to nonscientific evidence. See *id.* at 590 n.8 ("Rule 702 also applies to 'technical, or other specialized knowledge.' Our discussion is limited to the scientific context because that is the nature of the expertise offered here."). Six years after *Daubert* was decided, the Supreme Court addressed this issue in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Grounding its analysis in Rule 702's language, the Court explained:

---

able principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

> This language makes no relevant distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. It makes clear that any such knowledge might become the subject of expert testimony. In *Daubert*, the Court specified that it is the Rule's word "knowledge," not the words (like "scientific") that modify that word, that "establishes a standard of evidentiary reliability." Hence, as a matter of language, the Rule applies its reliability standard to all "scientific," "technical," or "other specialized" matters within its scope.

*Id.* (quoting *Daubert*, 509 U.S. at 589-90). Accordingly, after *Kumho Tire*, *Daubert* is applicable to all types of expert testimony and certainly to the expert testimony presented in this litigation.

¶ 18. In Vermont, we adopted the *Daubert* analysis, concluding that because our rules of evidence are "essentially identical to the federal ones on admissibility of scientific evidence" it makes sense to adopt admissibility principles similar to those used in the federal courts. *State v. Brooks*, 162 Vt. 26, 30, 643 A.2d 226, 229 (1993). This decision was typical of the at least thirty states that have done the same, based on similar reasoning. See *Christian v. Gray*, 2003 OK 10, ¶ 2 n.2, 95 P.3d 591 (collecting cases). Following the *Brooks* decision, in *Streich*, 163 Vt. at 342, 658 A.2d at 46, we reiterated our decision to follow *Daubert* and reject *Frye*. In 2000, although not explicitly, we followed *Kumho Tire*, when we applied the *Daubert* standard in *State v. Kinney*, 171 Vt. 239, 248-49, 762 A.2d 833, 841-42 (2000), where an expert testified about rape trauma syndrome. Recently, we made our adoption of *Kumho Tire* explicit by amending V.R.E. 702 to include its holding. See 2004 Amendment to V.R.E. 702 (effective July 1, 2004) (making V.R.E. 702 identical to Fed. R. Evid. 702, note 4, *supra*).

¶ 19. Following *Daubert* and *Kumho Tire*, trial judges must now act as gatekeepers who screen expert testimony ensuring that it is reliable and helpful to the issue at hand before the jury hears it. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265-66 (2d Cir. 2002). If the judge finds that the evidence meets both *Daubert* prongs, the proponent may then present its expert. Conversely, if the judge finds the evidence insufficient to satisfy either prong, the proffered testimony is excluded and never presented to the jury. We emphasize, however, that *Daubert* presents an admissibility standard only. The admitted evidence does not alone have to meet the propo-

nent's burden of proof on a particular issue, and, of course, the expert witness remains subject to cross-examination. *Reichert v. Phipps*, 2004 WY 7, ¶ 9, 84 P.3d 353.

¶ 20. This brings us to three preliminary issues we must address before we consider USGen's claim of error: (1) the standard of review for a decision of a trial judge admitting or excluding evidence under *Daubert* and V.R.E. 702; (2) whether *Daubert* applies in a bench trial; and (3) whether *Daubert* applies to data inputs as well as the methodology employed by the expert. We begin with the standard of review.

¶ 21. Although we have not specifically articulated a standard of review for *Daubert* rulings, we have held that admissibility decisions under V.R.E. 702 are reviewed only for abuse of discretion. See *Trotier v. Bassett*, 174 Vt. 520, 523, 811 A.2d 166, 170 (2002) (mem.); *State v. Griswold*, 172 Vt. 443, 447-48, 782 A.2d 1144, 1147-48 (2001); *State v. Gomes*, 162 Vt. 319, 329-30, 648 A.2d 396, 403-04 (1994). We revisit these rulings only because a number of courts have held that a less deferential standard of review applies to *Daubert* challenges. See, e.g., *Jennings v. Baxter Healthcare Corp.*, 14 P.3d 596, 603 (Or. 2000) (holding that "the question whether scientific evidence is admissible is reviewed for errors of law"); *Gentry v. Mangum*, 466 S.E.2d 171, 177 (W. Va. 1995) ("The trial court's determination regarding whether the scientific evidence is properly the subject of 'scientific, technical, or other specialized knowledge' is a question of law that we review *de novo*."); C. Mueller, *Daubert Asks the Right Questions: Now Appellate Courts Should Help Find the Right Answers*, 22 Seton Hall L. Rev. 987, 1019 (2003) (arguing that appellate courts should use a more "exacting standard of review" than abuse of discretion when reviewing trial court's decision to admit evidence under *Daubert*). Nevertheless, we conclude that a special standard of review for *Daubert* challenges is inappropriate.

¶ 22. We note at the outset that the U.S. Supreme Court has held that abuse of discretion is the appropriate standard of review for *Daubert* rulings in the federal courts. *General Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997). We are also persuaded by those state courts that have analyzed the issue and applied abuse of discretion review. The Alaska Supreme Court observed in *State v. Coon*, 974 P.2d 386, 399 (Alaska 1999), that there are at least three reasons to apply an abuse of discretion standard to *Daubert* challenges. Each of these reasons applies here. First, the general standard for review of evidentiary rulings is abuse of discretion, and there is no persuasive reason to deviate for *Daubert* rulings. See *id.* at 399. We similarly use abuse of

discretion review for evidentiary rulings generally. E.g., *State v. Gemler*, 2004 VT 3, ¶ 11, 176 Vt. 257, 844 A.2d 757 ("We will reverse a trial court's decision to admit evidence only if the court withheld or abused its discretion."); *Bazzano v. Killington Country Vill., Inc.*, 2003 VT 46, ¶ 5, 175 Vt. 534, 830 A.2d 24 (mem.) (holding that the reliability and relevance of witness's testimony was for trial court to assess, and, absent an abuse of discretion, we will not overturn trial court's decision to admit testimony). Second, although appellate courts are occasionally presented with broad, categorical admissibility decisions, see *Kinney*, 171 Vt. at 250, 762 A.2d at 842, the far more common *Daubert* issue depends heavily on the record made in the trial court and the credibility of the expert witness presenting the disputed evidence. *Coon*, 974 P.2d at 399; *State v. Alberico*, 861 P.2d 192, 205 (N.M. 1993). The trial court is in the best position to assess the expert's credibility, as this case demonstrates.

¶ 23. Finally, on this point, abuse of discretion review comports with the flexible standard developed in *Daubert*. *Coon*, 974 P.2d at 399. We emphasized this flexibility in adopting the *Daubert* standard. *Streich*, 163 Vt. at 342-43, 658 A.2d at 46-47. It would be incongruous for us to recognize the trial court's discretion in applying the *Daubert* factors, but be unwilling to defer to that discretion on review.

¶ 24. Thus, we apply an abuse of discretion standard of review to the trial court's decision to admit Dr. Silkman's testimony. When reviewing a trial court's decision to either admit or exclude expert testimony we consider whether the judge's decision was either made for reasons clearly untenable or was unreasonable. *Quenneville v. Buttolph*, 2003 VT 82, ¶ 24, 175 Vt. 444, 833 A.2d 1263. Absent a clear showing of judicial error, we will affirm the trial court's decision to admit or exclude the proffered testimony. This does not mean, however, that we will not engage in a substantial and thorough analysis of the trial court's decision and order "to ensure that the trial judge's decision was in accordance" with *Daubert* and our applicable precedents. *Alberico*, 861 P.2d at 206.

¶ 25. The second preliminary question flows from the Town's argument that *Daubert* is inapplicable to a bench trial. The Town contends that during a bench trial the judge is not obligated to perform *Daubert*'s gatekeeping function because the need for this function is to avoid jury confusion and exposure to unreliable or irrelevant testimony. In support of this argument, the Town cites a number of cases

that describe the role of *Daubert* in a bench trial. Although the cases conclude that the court's gatekeeping role is less critical when the court sits as the fact-finder, none fully abandons the requirement that the judge find the expert's testimony relevant and reliable. *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000); *Berry v. School Dist. of Benton Harbor*, 195 F. Supp. 2d 971, 977 n.3 (W.D. Mich. 2002); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 596 n.10, 597 (D.N.J. 2002); *Volk v. United States*, 57 F. Supp. 2d 888, 896 n.5 (N.D. Cal. 1999); *Ekotek Site PRP Comm. v. Self*, 1 F. Supp. 2d 1282, 1296 n.5 (D. Utah 1998).

■ ¶ 26. As we explained above, the *Daubert* standards have essentially been codified in V.R.E. 702, as recently amended. The Vermont Rules of Evidence are applicable in bench trials. V.R.E. 101, 1101. We have applied Rule 702 to the admissibility of expert testimony in bench trials. E.g., *Soutiere v. Soutiere*, 163 Vt. 265, 269, 657 A.2d 206, 208 (1995); *Brown v. Whitcomb*, 150 Vt. 106, 111, 550 A.2d 1, 4 (1988). Nevertheless, we agree that in the absence of a jury, the screening function of the judge is diminished. Thus, we conclude that *Daubert* must still be followed, albeit in a somewhat more relaxed manner. See *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) (acknowledging lesser import of gatekeeping function in bench trials, while stressing that *Daubert* relevance and reliability standards must still be met). As Judge Richard A. Posner, sitting specially assigned, explained in *Smithkline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003), the *Daubert* standard must be applied in bench trials, but because *Daubert* "requires a binary choice — admit or exclude — . . . a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves."

¶ 27. The final preliminary question regards the Town's argument that the *Daubert* analysis is used exclusively to review an expert's methodology, and not his or her data inputs, and therefore *Daubert* is inapplicable because USGen contests data inputs. This argument is not consistent with *Kumho Tire* and its codification in V.R.E. 702. In *Kumho Tire*, the Court explained that *Daubert* requires a reliability determination with respect to the expert testimony's "factual basis, data, principles, methods, or their application." 526 U.S. at 149. In fact, the decision to exclude the evidence in *Kumho Tire* was based in part on concerns about the expert's visual inspection of the allegedly defective tire — that is, the data inputs for the expert's analysis. *Id.* at

154-56. As amended, V.R.E. 702 requires the court to determine whether the expert testimony "is based upon sufficient facts or data."

¶ 28. This case is somewhat similar to *In re Aluminum Phosphide Antitrust Litigation*, 893 F. Supp. 1497 (D. Kan. 1995), a class action suit where plaintiffs alleged that defendants conspired to fix the price of aluminum phosphide. *Id.* at 1498. In that case plaintiffs offered testimony from Dr. Richard C. Hoyt, an economist who has frequently testified in cases of all kinds. *Id.* at 1499-1500. All parties agreed that to determine whether defendants had fixed prices the best methodology was the "before and after" model. *Id.* at 1500. This model compares prices during two distinct time periods — one incorporating the alleged price fixing and the other, a normative period, with an estimated price reflecting no price fixing. *Id.* In conducting his analysis, Dr. Hoyt used the "before and after model" which required him to compare the actual price of aluminum phosphide with an estimated price — the price aluminum phosphide would have been selling at but for the price fixing. *Id.* at 1501. The court accepted Dr. Hoyt's methodology, but questioned his data inputs — the estimated price predictions. *Id.* at 1501-02. Because the court determined that the price predictions were unreliable, the court excluded Dr. Hoyt's testimony under *Daubert. Id.* at 1507.

¶ 29. Like the *Aluminum Phosphide* court, we conclude that data inputs are appropriately within the purview of *Daubert* and V.R.E. 702. See *Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 326 (N.D.N.Y. 2000). An opposite holding would require admission of unreliable expert opinion testimony because the unreliability is caused by the data used rather than the methodology used to apply the data. We reject the Town's argument that we should dismiss USGen's *Daubert* challenge to Dr. Silkman's testimony because it is based on data inputs.

¶ 30. As neither of the Town's arguments prevents us from reaching the merits of this case, we now consider USGen's claims of error under the abuse of discretion standard. We note at the outset of this discussion that the *Daubert* challenge goes solely to the reliability of Dr. Silkman's testimony. The testimony was undoubtedly relevant under *Daubert*. The precise issue in the case was the value of the Bellows Falls facility, and that is exactly what Dr. Silkman testified to.

¶ 31. Although USGen raised seventeen reasons why Dr. Silkman's testimony should be excluded, it has emphasized here its primary

reason: that the data inputs are an unreliable basis on which to project twenty years worth of income. This objection actually involves three related arguments: (1) Natsource's forward bid and ask data are an insufficient basis on which to project future revenues from the sale of energy; (2) even if Natsource data are sufficient generally, the use of one day of such data is not; and (3) even if Natsource data are sufficient to project one year of revenue, they are insufficient to project twenty years of revenue.[5] We review each argument in turn.

¶ 32. As to the first argument, the trial court squarely rejected it:

In reaching their estimates as to future prices for electrical power, both Dr. Silkman and Mr. Biewald placed substantial reliance on information published by Natsource. Natsource is a brokerage firm specializing in bilateral contracts for the purchase and sale of power to be delivered in the future. Bilateral agreements are distinguished from transactions brokered through a spot market, such as NEPOOL. However, since the deregulation of power markets, bilateral agreements have become increasingly useful as hedges to better insure predictability of revenues. Although an institutional futures market for sale of power is not as well-developed as for other commodities, power futures are now traded through Natsource, and a number of other private brokerage firms. An important aspect of Natsource's operations is the public availability of its trading data, a significant advantage recognized by active participants in the market, as well as others who require reliable information regarding the development and functioning of the electricity market, such as public utility commissions. Although USGen challenged both the reliability of Natsource trading information, as well as the extent to which it is relied upon by others, the Court is persuaded by

---

[5] It is not clear that USGen actually made the same arguments against admissibility in the trail court as here. The court ruled on a preliminary motion to exclude Dr. Silkman's valuation testimony, based primarily on excerpts from Dr. Silkman's deposition. Although the motion complained generally about the data inputs without specificity, its rationale for exclusion was that Dr. Silkman knew nothing about appraisal methodology, was not an expert in forecasting the future price of energy in New England, relied upon predicted future changes in energy regulatory policy and acknowledged in the past that his work could not be used to render a valuation conclusion. USGen focused more on its current primary arguments in cross-examination of Dr. Silkman at trial. Given that the arguments were eventually made, and the trial court relied heavily on Dr. Silkman's testimony, we exercise our discretion to rule on the admissibility arguments presented to us.

the testimony of the Town's experts that it is a commonly recognized source of data regarding electricity pricing.

. . . .

... As noted in the testimony of the Town's experts, the forward prices being reported by Natsource compared very closely to futures reported by two other trading sources, TFS and Platt's MW Daily, as well as to Energy Argus, a source of energy price projections relied upon by Mr. Filsinger.

¶ 33. USGen attacks this decision because the Natsource data do not show trading volumes and the liquidity of the market is unknown. The expert witnesses agreed on the income capitalization approach to determine the plant's value. That approach required each expert to forecast future income. Dr. Silkman relied first upon market data for sales of energy over the following year. In *Daubert* terms, as the trial court found, that data source was validated by public agency use in making electricity price forecasts and its similarity to other sources of market data. The trial court could conclude that this external validation overcame any concerns about trading volumes and the opaqueness of the market. The trial court acted well within its discretion in rejecting the argument.

¶ 34. Although USGen's second argument raises different considerations, we believe that the court appropriately rejected it. The main difference between the experts is represented by their predictions of future energy prices. They agreed that electrical energy prices would follow the course of natural gas prices, because new plants would generate electricity from natural gas and set the market prices, but disagreed about the future price of natural gas. At the time of valuation, April 1, 2001, natural gas prices had recently increased substantially, and, as a result, prices for electricity futures contracts had also increased markedly. Dr. Silkman believed that the higher natural gas and electricity prices represented a new floor that would continue indefinitely. By contrast, USGen's expert testified that prices prevailing on April 1 represented a price spike, and prices would fall to historic levels.

¶ 35. We emphasize the legal requirement that the asset to be taxed be valued on one date, April 1 of the year of taxation. 32 V.S.A. § 3482. Consistent with Dr. Silkman's view, the prices prevailing on that day, and not those in the days and weeks before April 1, represented the base. Although the prices were taken from one trading day, they

reflected delivery dates up to a year in the future. We recognize that we have been critical of testimony valuing property by the income capitalization method if it is based on income data from only one point in time. *Beach Props.*, 161 Vt. at 374, 640 A.2d at 53. That criticism came, however, in the context of a stable business where the expert witness failed to consider the property's potential for earning income in the future. *Id.* Here, the testimony is based on the expert's view of future earning potential in a new and volatile market, an opinion validated by actual market prices for future delivery. We conclude that the court acted well within its discretion in admitting the testimony under V.R.E. 702.

¶ 36. In reaching this conclusion on the second argument, we reject USGen's position that we should look at the actual path of gas prices following April 1, 2001. As USGen showed, they dropped after April 1, a development not predicted by Dr. Silkman. We do not believe that the actual movement of gas prices is a valid ground to reject Dr. Silkman's testimony or to prevent reliance upon it. The court was required to determine "the price which the property will bring in the market when offered for sale and purchased by another" as of April 1, 2001. 32 V.S.A. § 3481(1). A buyer of the facility on April 1 could not have known the price for gas or electricity after that date. Thus, actual future gas prices have no impact on valuation as of April 1.

¶ 37. USGen's third argument challenges the use of one year of income data to project a twenty-year revenue stream. We agree that the reliability of the income capitalization method of valuation can be questioned where the market in which future income is to be earned is new and volatile. Nevertheless, USGen does not challenge the use of the income capitalization approach, and each of the expert witnesses was required to predict future income in spite of the uncertainty. Dr. Silkman's method for doing so was transparent, and he explained his rationale for using it.[6] He explained that while Natsource data existed for deliveries beyond a year, too few sales existed to make the data reliable. Thus, he relied upon his conclusion that electrical energy prices prevailing on April 1, 2001 would continue for three years. He relied, in part, on anticipated changes in energy regulatory policy from

---

[6] USGen argued that Dr. Silkman admitted that he did not know how a purchaser would value the plant, apparently to set up the testimony of its expert that no buyer would use Silkman's analysis. Dr. Silkman responded that although he did not know how any particular purchaser would value the plant, and did not know whether they would employ Natsource data, they would follow the discounted cash flow methodology he used.

the Federal Energy Regulatory Commission (FERC).[7] We conclude that to the extent USGen's argument shows weaknesses in Dr. Silkman's testimony, it goes to weight, not admissibility; accordingly, we reject the argument.

¶ 38. In addition to the above arguments,[8] USGen attacked Dr. Silkman's qualifications to render the opinion he offered asserting: (1) he has no training in appraisals or appraisal methodology; (2) he has no familiarity with the Uniform Standards of Professional Appraisal Practice; (3) he has never testified in a court proceeding as an expert; (4) he has never inspected or even visited the Bellows Falls Station; and (5) he is not an expert in predicting future prices in the New England Electrical market. We stress that the trial court has wide discretion to determine the qualifications of an expert witness. *State v. Hicks*, 148 Vt. 459, 461, 535 A.2d 776, 777 (1987). If an expert's limitations are clear, both on direct testimony and cross-examination, "the court may not be said to have abused its discretion in allowing the testimony." *Cappiallo v. Northrup*, 150 Vt. 317, 319, 552 A.2d 415, 417 (1988). "A professional certification" is unnecessary to qualify as an expert. Reporter's Notes, V.R.E. 702.

---

[7] USGen challenged Dr. Silkman's reliance on anticipated changes in FERC policy as improper. We note that the testimony went to the cost of capacity, and not energy, a relatively minor part of the value testified to by Dr. Silkman. Dr. Silkman gave a detailed analysis of FERC's actions in this area, emphasizing that its policy was in flux after deregulation. We conclude that any objection to this analysis went to the weight to be accorded his testimony.

[8] USGen also argued that Dr. Silkman's testimony should be excluded because he was a registered lobbyist for the Town. Dr. Silkman responded that he had registered as a lobbyist because the Town had hired him to help in their plan to establish a municipal electric utility and he had testified in the Vermont Legislature in that capacity. We fail to see how Dr. Silkman's registration as a lobbyist goes to his qualifications to testify under V.R.E. 702.

USGen also challenged Dr. Silkman's valuation, in part, because he took USGen expense and capital expenditure data partially from that estimated by a valuation consultant for USGen who did not testify in this case. It argues, in essence, that Dr. Silkman was merely a conduit for the opinion of another expert in violation of our decision in *Dupona v. Benny*, 130 Vt. 281, 287, 291 A.2d 404, 408 (1972). The error, if any, is harmless. In its decision, the court concluded that the expense testimony of Biewald was the most credible, but failed to include that data in its valuation, instead relying wholly on the Silkman valuation. This mistake inured to the benefit of USGen because Silkman recognized greater expenses leading to a lower net income figure for the income capitalization. Thus, the valuation consultant data helped USGen.

¶ 39. The evidence indicated that Dr. Silkman holds both a Masters and a Ph.D. in Ecomonics from Yale University. He has consulted for many years in the energy field, and he is president of Competitive Energy Services in Maine, a company that arranges electricity supply contracts in the New England power market. He has testified before numerous public utility commissions and other public bodies. He has taught economics at the university level, and his course included the methodology for valuing assets by the income capitalization approach. He is not a licensed appraiser and therefore unfamiliar with the Uniform Standards of Professional Appraisal practice; he has never inspected the Bellows Falls facility; and he regularly provides advice to clients regarding the future price of electricity. Based on the above, the trial court ruled:

> Dr. Silkman is amply qualified by education and experience to undertake the type of economic analysis that undergirds each expert's opinion in this case, and to offer opinion testimony regarding the workings of the market for electricity. Indeed, as noted by the Town, each expert was well-qualified, and worked diligently to synthesize a bewildering amount of information. Yet the Court also agrees with the Town's proffer:

> "Dr. Silkman showed himself to have the broadest experience of any of the witnesses in various disciplines that bear on New England power markets: as an economics teacher at the college level; as an entrepreneur in the market, as a consultant and advisor to public utilities commissions and legislatures throughout Northern New England; as an advocate at the Federal Energy Regulatory Commission ('FERC') and even as an individual member of the New England Power Pool."

This decision was well within the trial court's discretion, and we affirm it.

¶ 40. For the above reasons, we conclude that the trial court did not err in admitting Dr. Silkman's testimony with respect to the value of the Bellows Falls hydroelectric facility on April 1, 2001. We additionally consider whether the court erroneously relied upon that testimony.

¶ 41. Throughout its claims of error, USGen asserts that the superior court decision is inconsistent with our decision in *Beach Proper-*

*ties, Inc. v. Town of Ferrisburg.* The exact point of comparison has been somewhat unclear because the *Beach Properties* decision does not involve the admissibility of expert evidence, the explicit claim of error made by USGen, but instead it involves the sufficiency of evidence to support a valuation based on the income capitalization methodology. Nevertheless, we exercise our discretion to examine USGen's *Beach Properties* arguments because, as we have held above, USGen's claims go much more to weight and sufficiency than to admissibility. For this reason, we address whether the court erred in relying upon Dr. Silkman's evidence.

¶ 42. In *Beach Properties,* the Town of Ferrisburg appealed a State Board of Appraisers decision valuing by the income capitalization method a summer resort and convention center on the shores of Lake Champlain. 161 Vt. at 370, 640 A.2d at 51. The property was owned by a family corporation that was owned in turn by two stockholders as a result of an intra-family stock transfer. Following the stock transfer, which was based on "a theoretical sale price for the entire property," the taxpayer's appraiser arrived at the property's value using an income capitalization method that relied on the net income produced in a single year and the intra-family stock transfer. *Id.*

¶ 43. The taxpayer's appraisal was almost a million dollars lower than that of the Town and was the taxpayer's main evidence before the Board. The Board accepted the taxpayer's appraisal, and the Town then appealed claiming that "the Board of Appraisers erred by making findings that were so devoid of evidentiary support as to be clearly erroneous." *Id.* We agreed with the Town's argument and reversed the Board's decision. *Id.* at 372, 640 A.2d at 52. For the same reasons, USGen argues that we should reverse the superior court decision here. We cannot agree.

¶ 44. There is one superficial similarity between this case and *Beach Properties* and many significant differences. First, we stress the differences. We reversed the Board's decision in *Beach Properties* mainly because the Board "made virtually no findings of its own, but rather described and summarized the dispute between the parties." *Id.* at 371, 640 A.2d at 52. Here, in sharp contrast, the trial judge rigorously reviewed all three experts' testimony, made detailed and extensive findings based on that review, and explained why he credited particular testimony above other testimony.

¶ 45. Second, we concluded that the capitalization rate used by taxpayer's appraiser was unreliable because it was based on the rate of

return for one year of the business being valued, rather than the rate available from comparable investments. *Id.* at 373-74, 640 A.2d at 53-54. Additionally, we rejected the rate because it was based on a fictitious designation of value. *Id.* We concluded that the appraiser had "derived a capitalization rate from a postulated fair market value for the property under appraisal, rather than deriving fair market value from a postulated capitalization rate based on investments with similar risk." *Id.* at 374, 640 A.2d at 53. Here, by comparison, the capitalization rate was externally derived and agreed to by all of the expert witnesses.

¶ 46. Third, the expenses necessary to produce the income were based on "internal, unaudited financial statements" and were not sufficiently itemized to determine whether they were reasonable, especially with respect to the salaries of family members. *Id.* In contrast, the expense figures used by the experts here were very detailed and were the subject of disagreements and cross-examination. The trial judge made findings specifically resolving the disagreements.

¶ 47. This leads us to the similarity. The income and expense figures for the resort in *Beach Properties* were based on one year's experience, the calendar year before the valuation date. We noted that for an on-going resort business income is affected by "a wide variety of factors, ranging from the competence of management to the economic climate experienced by the establishment's customer base to the weather," 161 Vt. at 373, 640 A.2d at 53, and that "it is generally expected that a 'stabilized annual net income' reflecting more than one year's set of figures will be used as the basis for income capitalization." *Id.* at 374, 640 A.2d at 53. USGen argues that Silkman's analysis has the same defect because it is based on one day of market data from which twenty years of income is projected.

¶ 48. We need not decide whether this weakness in the expert's analysis alone would make the valuation unsustainable. Again, we stress that the similarity of approach on which USGen relies is superficial. As we stated in our analysis of the admissibility of Dr. Silkman's testimony, there are vast differences between income generation from a stable resort business and a hydroelectric plant. As the trial court fully explained, the historical track record of energy prices was of limited value in light of deregulation, and energy prices, the key component of revenues, were steadily rising up to April 1, 2001, the date of valuation. The court was faced with a dispute among the experts on the relation of this price rise to long term energy prices. USGen's expert testified that he believed it was a short-term price

spike which would fall back to historic averages. The Town's experts, particularly Dr. Silkman, testified that it was a new baseline for future prices so that historical prices were of limited significance in determining long-term future prices. The trial court resolved the disagreement in favor of the Town, concluding that a purchaser on April 1, 2001 would have believed that prices would move around the April 2001 level, and would not drop back as USGen's expert predicted.

¶ 49. Our review of the trial court's valuation decision is quite deferential. See *Waller v. American Int'l Distrib. Corp.*, 167 Vt. 388, 394, 706 A.2d 460, 464 (1997) ("The weight to be given to a particular method of valuation . . . is within the sound discretion of the court."). In addition to the testimony of the Town's expert witnesses, particularly Dr. Silkman, the trial court had one other major reason for its conclusion, its strong disagreement with the conclusion of USGen's expert. The trial court adopted the Town's finding that:

> It is, of course, understandable that USGen would seek to reduce its tax burden. But here, it has presented an expert who would cut the taxable valuation from $90,990,200 to approximately $37,000,000 . . . For six years prior to the sale of this plant to USGen, the *agreed* value for the USGen property [with the previous owner] was $81,000,000. Now, as of April 1, 2001, after the wholesale market had undergone a very substantial increase, USGen claims the value of the Station plummeted to less than half that level.

We also note the great differences between the trial court opinion in this case and that in *New England Power Co. v. Town of Barnet*, 134 Vt. 498, 367 A.2d 1363 (1976), our one earlier case overturning the property tax valuation of a hydroelectric plant. In that case, we reversed the trial court's valuation decision because "the findings below, while both painstaking and extensive, are largely mere recitals of the testimony given," *id.* at 502, 367 A.2d at 1366, and the court failed to explain specifically why it rejected the opinions of the experts and found a valuation between their opinions. *Id.* at 503, 367 A.2d at 1366-67. Here, the court carefully explained its decision-making process and how it was influenced by the experts' testimony. If the trial court considered the various approaches offered, assigned weight to each approach, and provided a thorough explanation for its findings and conclusions we will not overturn the court if its order "appears to

be fair, just and equitable according to the evidence presented." 134 Vt. at 506, 367 A.2d at 1368. We conclude that the trial court's reliance on Dr. Silkman's analysis, including the decision to base long term income predictions on bilateral contract prices as of April 1, 2001, and its rejection of the conclusion of USGen's valuation expert, was within its discretion.

¶ 50. Finally, USGen argues that the trial court erred by accepting the lister's allocation and assigning 90% of the value of the Bellows Falls facility to the Town. The trial court had before it three opinions of the percentage of the facility's value that lies within the Town: Laurie Rowell, Town lister, 90%; Biewald, 83.7% and Filsinger, 86.24%. Each briefly explained his or her method for reaching the conclusion indicated, but very little of the testimony was on this allocation issue. The court accepted Ms. Rowell's allocation. It explained that it could not credit the opinion of USGen's expert because it was based on cost information, the source of which was undisclosed and unexplained. Thus, it accepted the "reasoned judgment" of the lister.

¶ 51. In addition to being a Town lister, Rowell is a lawyer. She has attended a number of courses on property valuation and specifically courses on valuing electrical generation assets. She gave her reasons for the 90% allocation and was cross-examined on those reasons. While there was no discussion of her qualifications as an expert witness under Rule 702, her valuation opinion was based on her training, and there was no objection to this opinion.

¶ 52. The lister's allocation enjoys a presumption of validity under our precedents. *Id.* at 507, 367 A.2d at 1369 ("This court has recognized that a presumption of validity and legality attaches to the actions of the listers."); accord *Vermont Elec. Power Co. v. Town of Vernon*, 174 Vt. 471, 472, 807 A.2d 430, 433 (2002) (mem.). Although we presume the lister's allocation is correct, the presumption is locative only and any admissible evidence can rebut this presumption. *Woolen Mill Assocs. v. City of Winooski*, 162 Vt. 461, 463, 648 A.2d 860, 862 (1994).

¶ 53. Here, the Town argues that USGen failed to overcome the presumption behind the lister's decision. We reiterate, however, that any admissible evidence, including that offered by the Town, can overcome the presumption. *Id.* The testimony of Biewald and Filsinger overcame the presumption.

¶ 54. We emphasize, however, that USGen has the burden of persuasion on all issues in a property tax appeal. See *Beach Props.*, 161 Vt. at 375, 640 A.2d at 54. The court was not persuaded by its evidence.

USGen responds that, even so, the court could not rely upon the Rowell's testimony because it lacked "any foundation or explanation." We disagree. The Town showed her qualifications to offer an opinion on utility property valuation, and she stated her opinion on the allocation of the facility's value and the basis for the opinion. USGen did not challenge her qualifications, relying instead on cross-examination as its basis. The trial court was the proper judge of the weight to be accorded her testimony.

*Affirmed.*