2008 VT 110



In re Appeal of JAM Golf, LLC
(2006-307)

 

2008 VT 110

 

[Filed 22-Aug-2008]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40
as well as formal revision before publication in the Vermont Reports. 
Readers are requested to notify the Reporter of Decisions, Vermont Supreme
Court, 109
 State Street, Montpelier, Vermont05609-0801
of any errors in order that corrections may be made before this opinion goes to
press.

 

 


 2008 VT 110
 
  


 No. 2006-307
 
  


 In re Appeal of JAM Golf, LLC
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
  
 
 
 Environmental Court
 
 
  
 
 
  
 
 
  
 
 
 March Term, 2008
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Merideth Wright, J.
 
 
  
 
 William Alexander Fead of Fead Construction Law, PLC, Burlington for Appellant.

 

Amanda S. E. Lafferty of Stitzel,
Page & Fletcher P.C., Burlington, for Appellee.

 

 

PRESENT:  Reiber, C.J.,
Johnson, Skoglund and Burgess, JJ., and Reiss, D.J.,

                  
  Specially Assigned

 

 

¶ 1.            
BURGESS, J.   Property owner JAM Golf, LLC (applicant)
appeals the Environmental Court’s denial of a permit for a proposed ten-lot
subdivision in South Burlington.  Applicant raises four issues on appeal,
claiming the court erred by: (1) admitting expert testimony concerning wildlife
corridors; (2) concluding that the project did not protect wildlife habitat or
scenic views; (3) finding that the project did not conform to the city plan;
and (4) denying the project a permit, rather than remanding the case to the
Development Review Board.  We reverse the court’s conclusion and remand
for further findings under § 26.151 of the South Burlington Zoning Ordinance. 

¶ 2.            
Applicant owns part of a 450-acre planned residential development (PRD)
known as the Vermont National Country Club.  The property is located in the
Southeast Quadrant Zone (“Quadrant”) of South Burlington.  The parcel is
permitted for 296 residential units, as well as for an eighteen-hole golf
course.  Applicant sought to obtain permits for ten additional lots on an
approximately seven-acre portion of the development known as “the
woodland.”  

¶ 3.            
The woodland sits on a ridge in the golf course and is bounded by three
fairways and by another residential development.  Several species of
hard-mast-producing trees,[1]
including hickory, butternut, beach, and tall pines, populate the
woodland.  The grounds contain shrubs, saplings, and berry patches. 
Wildlife experts directly observed or noted evidence of deer, fox, turkey,
raccoon, squirrel, rabbit, other rodents, and birds in the woodland.  The
woodland is also adjacent to wetlands and an open space located on the golf
course.  

¶ 4.            
Applicant applied to the Board to amend the current PRD to accommodate
ten additional lots in the woodland.  The Board denied the application,
and applicant appealed this denial to the Environmental Court.  Four years
later, in a six-page decision, the court denied the application without
prejudice.[2] 
The court held that the project did not satisfy the mandate of § 26.151(g)
requiring that PRDs “protect important natural
resources including . . . scenic views” and “wildlife habitats.”  In
addition, the court concluded that the project violated § 26.151(l), which
requires that the amended PRD conform to the city plan.  The city plan for
the Quadrant requires residential developments to protect wildlife habitat, and
the court concluded that the applicant failed to do so here.  This appeal
followed.

¶ 5.            
On appeal, applicant claims that: (1) expert testimony concerning
wildlife corridors was inadmissible, because the testimony was unreliable; (2)
the record does not support the court’s conclusion that the project does not
protect wildlife habitats; (3) the record does not support the court’s
conclusion that the project does not protect scenic views; (4) the city plan is
not sufficiently specific to be enforceable; and (5) the court should have
remanded the application to the Board for guidance instead of denying the
application. 

I.

¶ 6.            
Applicant contends that the Environmental Court erred in admitting
testimony from South Burlington’s wildlife expert concerning wildlife
corridors.  Specifically, applicant faults the court for not making
specific findings of reliability necessary under Daubert
v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Had the
court conducted the inquiry, applicant maintains, the court would have found
the testimony unreliable and thus inadmissible.

¶ 7.            
Under Vermont Rule of Evidence 702, expert testimony will only be
admitted if it “ ‘assist[s] the trier of fact to
understand the evidence or to determine a fact in issue,’ “ and if: “(1) the
testimony is based upon sufficient facts or data, (2) the testimony is the
product of reliable principles and methods, and (3) the witness has applied the
principles and methods reliably to the facts of the case.”  985
Assocs., Ltd. v. Daewoo Elec. Am., Inc., 2008 VT 14, ¶ 6, __ Vt. __, 945
A.2d 381 (citing V.R.E. 702).  Accordingly, trial courts act as
“gatekeepers who screen expert testimony ensuring that it is reliable.”  USGen New England v. Town of Rockingham, 2004
VT 90, ¶ 19, 177 Vt. 193, 862 A.2d 269.  

¶ 8.            
To be reliable, expert testimony must be supported by “scientific
knowledge.” Daubert, 509 U.S. at 589.
 The Court in Daubert defined the
adjective “scientific” as “ground[ed] in the methods
and procedures of science,” and stated that “knowledge” must be more than a
subjective belief or speculation.  Daubert,
509 U.S. at 589-90.  In determining whether expert testimony is
“reliable,” trial courts may consider such factors as: (1) whether the
scientific technique can be tested; (2) whether the technique was peer
reviewed; (3) any potential error associated with the technique; and (4)
whether the technique was generally accepted in the scientific community.
 USGen New England, 2004 VT 90, ¶
16.  This list is not exhaustive, however, and the Rule 702 admissibility
standard is flexible.  Id.  In addition, in the context of
bench trials, the trial court’s gatekeeper function is not as crucial because
it “requires a binary choice—admit or exclude[;]. . .
a judge in a bench trial should have discretion to admit questionable technical
evidence, though of course he must not give it more weight than it deserves.”
 Id. ¶ 26 (quoting Smithkline
Beecham Corp. v. Apotex Corp., 247
F.Supp.2d 1011, 1042 (N.D. Ill. 2003)).  We review Rule 702 determinations
for abuse of discretion.  Id. ¶ 21.

¶ 9.            
Applicant claims that the testimony of the City’s expert, Mr. Parsons,
is unreliable, because it rested on his speculative and subjective beliefs
rather than on “scientific knowledge.”  Applicant cites Mr. Parsons’
qualification of his testimony concerning wildlife corridors as “preliminary,”
“potential,” and “hypothetical.”  Applicant essentially asserts that all
such testimony is per se unreliable.  Applicant misconstrues the standard.
 Expert testimony “does not alone have to meet the proponent’s burden of
proof” to be admissible.  USGen New
England, 2004 VT 90, ¶ 19.  In order to tease out deficiencies of
expert testimony, opponents should attack testimony of this nature through the
adversarial process.  Daewoo, 2008 VT 14, ¶ 16.

¶ 10.        
Despite the “hypothetical” nature of some of Mr. Parsons’ testimony, we
conclude that the testimony was reliable for the purposes of Daubert, because the testimony was based on the type
of facts and data with which wildlife experts are familiar—topographic features
and wildlife movement patterns.  As a wildlife expert, Mr. Parsons is
accorded the authority to interpret and rely on such technical information,
even if he has not observed it firsthand.  V.R.E. 703; Daubert,
509 U.S. at 594.  Mr. Parsons’ conclusions were not speculative but
instead were “based on what is known.”  Daubert,
509 U.S. at 590.  In this case, Mr. Parsons relied on the topography of
the woodland, the close proximity of major roads, the presence of cover, his
observation of wildlife and their nests, dens and scat on the parcel, and the
typical movement patterns of common wildlife on the land to offer an opinion
that the woodland sat in a “potential” wildlife corridor.  According to
Mr. Parsons, these methods are used by other scientists, including those
employed by governmental entities that map and protect wildlife corridors based
on aerial photographs and topographic maps.  The general use of Mr.
Parsons’ methods suggests they are a reliable technique to identify “potential”
wildlife corridors.  See USGen New
England, 2004 VT 90, ¶ 16.

¶ 11.        
While we agree with applicant that this testimony is not dispositive as
to whether wildlife actually use the woodland as a corridor, we cannot conclude
that Mr. Parsons’ testimony is the kind of “junk science” that Daubert meant to exclude.  Daewoo, 2008
VT 14, ¶ 8.  In finding evidence to be reliable, the trial court is not
expected to make a substantive decision on the merits of the proponent’s
argument but is instead required to make an “inquiry into the factual basis and
methodology” used by the expert witness.  Id. ¶ 11.  Because
Mr. Parsons offered a sufficient basis for his testimony, we cannot conclude
that the court abused its discretion by admitting it as evidence.

II.

¶ 12.        
Applicant next claims that the Environmental Court erred in concluding
that the project does not satisfy § 26.151(g) of the Zoning Ordinance, which
requires PRD designs to “protect important natural resources including streams,
wetlands, scenic views, wildlife habitats and special features such as mature
maple groves or unique geologic features.”  Applicant challenges both the
court’s interpretation of the ordinance and its underlying findings of
fact.  Specifically, applicant asserts that § 26.151(g): (1) requires that
PRD designs “protect” only important wildlife habitat and scenic views;
and (2) allows developers to offer mitigation in order to meet this
requirement.  Applicant complains that the habitat and view at issue here
are not, and cannot be, considered “important” from the court’s findings.

¶ 13.        
Unfortunately, the ordinance as written is essentially standardless.  Although applicant challenges the
court’s interpretation of the ordinance, rather than attacking the ordinance
itself, § 26.151 is flawed, since it provides no standards for the court to
apply in determining what would constitute a failure to “protect” the listed
resources.  Zoning ordinances must “specify . .
. sufficient conditions and safeguards” to guide applicants and decisionmakers.  Town of Westford v. Kilburn, 131
Vt. 120, 122, 300 A.2d 523, 525 (1973).  We will not uphold a statute that
“fail[s] to provide adequate guidance,” thus leading to “unbridled
discrimination” by the court and the planning board charged with its
interpretation.  Id. at 125, 300 A.2d at 526; see also In re
Handy, 171 Vt. 336, 348-349, 764 A.2d 1226, 1238 (2000); State v.
Chambers, 144 Vt. 234, 239, 477 A.2d 110, 112-13 (1984).  

¶ 14.        
“Protect,” as defined in § 26.151, cannot be the equivalent of total
preservation, because the same regulations allow for development, which, by
necessity, must reduce wildlife habitat and affect scenic views.  How much
less than total preservation qualifies as sufficient protection, however, we
cannot know, because the regulations do not say.  Even had the trial court
endeavored to apply a “reasonableness” measure to this term, § 26.151 would be
unworkable.  The language of the regulations offers no guidance as to what
degree of preservation short of destruction is acceptable under the
statute.  From a regulatory standpoint, therefore, § 26.151(g) provides no
guidance as to what may be fairly expected from landowners who own a parcel
containing wildlife habitat or scenic views—both common situations in
Vermont—and who wish to develop their property into a PRD.  Such standardless discretion violates property owners’ due
process rights.  In re Miserocchi, 170
Vt. 320, 325, 749 A.2d 607, 611 (2000).  We thus strike this provision of
the ordinance and reverse the Environmental Court’s conclusion that the project
fails to meet its requirements. 

III.

¶ 15.        
Applicant next claims that the court erred in denying its application
for failure to comply with the city plan.  Applicant makes three distinct
arguments: (1) the Vermont Planning and Development Act does not authorize
towns to require that subdivisions and PRDs conform
with city plans; (2) the city plan is vague and unenforceable; and (3) the
application conformed to the city plan. 

¶ 16.        
First, applicant asserts that the enabling statute, 24 V.S.A. § 4411,
does not authorize towns to mandate that development follow the city
plan.  While this is true, neither does Title 24 prohibit towns from
enforcing such a requirement.  We note that 24 V.S.A. § 4410 grants broad
authority to towns to implement their plan through zoning bylaws: 

[a]
municipality that has adopted a plan through its bylaws may define and regulate
land development in any manner that the municipality establishes in its bylaws,
provided those bylaws are in conformance with the plan and are adopted for the
purposes set forth in section 4302 of this title.  In its bylaws, a
municipality may utilize any or all of the tools provided in this subchapter
and any other regulatory tools or methods not specifically listed.

 

This section speaks in permissive
terms.  Towns may implement their plans through
“any . . . regulatory tools or methods not specifically
listed,” so long as the “bylaws are in conformance with the plan.”  Here,
the City has chosen to incorporate the city plan into its Bylaws.  See
§ 26.151(l) (a PRD “will [c]onform with the
City’s Comprehensive Plan”).  Due to the broad authority granted to towns
to implement their city plans, we cannot conclude that § 26.151 is an
unauthorized method of zoning regulation.

¶ 17.        
Nevertheless,
all ordinances are subject to the limits of our Constitution, and we will not
enforce laws that are vague or those that delegate standardless
discretion to town zoning boards.  Handy, 171 Vt. at
348-49, 764 A.2d at 1237-38.  This brings us to applicant’s next
argument—that the city plan is not sufficiently specific to be
enforceable.  While cities may require subdivisions to conform to their
city plan, as here, city authorities may not deny permission for a project when
there is not a “specific policy set forth in the plan . . .
stated in language that is clear and unqualified, and creates no
ambiguity.”  In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt.
520, 838 A.2d 906 (citation and quotation omitted).  A city plan must
contain “specific standards” to guide enforcement to be given regulatory
force.  Id.

¶ 18.        
In this case, we find no specific standards to guide enforcement. 
The Environmental Court concluded that the city plan “requires residential
development to be designed to protect wildlife corridors and habitat, and to
protect scenic views.”  While the city does specifically identify some
generic natural resources to be protected—such as scenic views—the city plan
fails to define what in particular is to be protected, and provides no
standards as to how or when development should be restricted to accomplish
protection.  At best, in this regard, the zoning scheme is confusing. 
For example, although the city’s official zoning map specifically labels
certain areas of the Quadrant as “important scenic views,” the view deemed
scenic by the Environmental Court in this case was not so designated by the
city.  The ordinance cannot leave such designations to the unfettered
discretion of the Environmental Court.  See Handy, 171 Vt. at 349,
764 A.2d at 1238.    

¶ 19.        
The city plan also lays out a general policy of promoting growth and
residential development in the Quadrant that is at odds with the notion of
complete preservation of the status quo.  This growth-oriented policy is
in tension with the goal of protecting natural resources, and the city plan
provides insufficient guidance as to how the Board or a landowner should balance
these competing concerns when applying for or evaluating a permit
application.  As a result, this aspect of the city plan is too ambiguous
to be enforceable.  We therefore strike this provision of the ordinance,
and reverse the Environmental Court’s
conclusion that the project does not satisfy § 26.151(l).[3] 

Reversed and remanded for
the Environmental Court to make findings on the remaining § 26.151
criteria.

 

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











[1] 
Hard mast trees produce nuts, a food source high in nutritional value for
wildlife.

 





[2] 
Loathe to aggravate what already appears to have been an extreme delay in
reaching a decision at the trial level, we regret having to remand, but
nevertheless find a remand necessary for further findings based on the existing
record evidence as to whether or not the proposed project satisfies the
remaining § 26.151 PRD criteria yet to be addressed by the trial court.  





[3]  Applicant also claims that the project
conforms to the city plan, and challenges the Environmental
 Court’s decision to deny the permit instead of issuing a
conditional permit.  Because we conclude that the city plan contains
insufficient standards to be enforceable, and remand for further findings on
the other § 26.151 criteria, we need not address these remaining arguments.